ALAN R. BAUM (Calif. State Bar No. 42160)
Criminal Defense Associates
20700 Ventura Boulevard, Suite 301
Woodland Hills, California 91364
Telephone (818) 313-6870
Facsimile (818) 313-6871
E-Mail alan.baum@emailcda.com

Attorney for Defendant
JOSE DE LA CRUZ

*ORIGINAL*

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 0 1 2006

at ____ o'clock and ____ min. ____ M
SUE BEITIA, CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR-04-00185-SOM |
| Plaintiff, | ) | |
| v. | ) | **DEFENDANT'S MEMORANDUM** |
| JOSE DE LA CRUZ, | ) | **RE: SENTENCING, WITH** |
| Defendant. | ) | **EXHIBITS** |
| | ) | |

Defendant JOSE DE LA CRUZ, through counsel, hereby and herewith submits his

Memorandum Re: Sentencing, with Exhibits in this case.

Defendant reserves the opportunity to make additional comments through counsel

at the time of the sentencing hearing.

Dated: July 31, 2006

Respectfully submitted,

CRIMINAL DEFENSE ASSOCIATES

By _____
ALAN R. BAUM
Attorney for Defendant
JOSE DE LA CRUZ

1

# I.

## INTRODUCTORY COMMENT AND OVERVIEW

On November 22, 2004, Defendant Jose De La Cruz pled guilty to Counts 1 and 3 of the Superseding Indictment. Count 1 charges conspiracy to distribute methamphetamine, and  Court 3 charges possession with intent to distribute methamphetamine.  The conviction arises from Mr. De La Cruz's acts in April and May of 2004, culminating in his arrest in Honolulu on May 6th of that year.  He has been in custody at FDC Honolulu for the past 27 months.

This case has been somewhat complicated due to the shifts in Federal sentencing law while Mr. De La Cruz's matter has been pending.  Less than 6 weeks after Mr. De La Cruz's arrest, the United States Supreme Court issued its ruling in Blakely v. Washington, 124 S.Ct. 2531 (2004), which held that "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  The Supreme Court's decision in Blakely was then interpreted by our own circuit in United States v. Ameline. 376 F.3d 967 (9th Cir. 2004), and it was during this hiatus (post-Blakely/pre-Booker) when the defendant entered his plea of guilty.  About six weeks after the defendant's change of plea, the U.S. Supreme Court ruled in United States v. Booker. 125 S.Ct. 738 (2005).

This Honorable Court is very familiar with the procedural twists and turns that

2

sentencing policy in general, and its implementation in this district, have taken in the interim.  In fact, this Court issued a series of orders relevant to the question of sentencing jury trials which was crafted specifically with Mr. De La Cruz and similarly situated defendants in mind.  Those details will not be revisited here, as they are contained in their entirety within the court file for this case.  For the record, Defendant Jose De La Cruz, through undersigned counsel, wishes to adopt and incorporate by reference herein all of the pertinent legal arguments presented by Mr. De La Cruz's former counsel, William A. Harrison, in Defendant's "Memorandum Regarding Guilty Plea Without Admission As To Drug Amount That Would Trigger Mandatory Minimum" that was filed with this Court on January 28, 2005.  For purposes of the upcoming sentencing, however, Defendant Jose De La Cruz, through undersigned counsel, will proceed mindful of the Court's previously-referenced rulings.

As is well-established following the Supreme Court's ruling in United States v. Booker, *supra*, the now-advisory guidelines are only one of the factors to be considered at sentencing.  Although the Court is still instructed to consider them, they are no longer binding.  The Court is also meant to consider the various sentencing factors set forth in 18 U.S.C. 3553(a) which include, among other criteria, the fact that the sentence should be "*sufficient, but not greater than necessary* to comply with the purposes set forth in paragraph (2) of this subsection" [emphasis added], and that the court should consider the "nature and circumstances of the offense" and the "history and characteristics of the

3

defendant." The guiding factor to be considered in formulating an appropriate sentence is that the sentence imposed be reasonable.

Defendant Jose De La Cruz is a 38-year-old man who for most of his life has resided in or near to the community of Venice, California. He is the father of two biological children, Natasha, age 15, and Jeremy, age 10, and has been an exemplary father to his stepson Dustin, age 17, whom he raised since infancy. He is married to Delilah Medina De La Cruz who resides in El Segundo, California with the couple's three children.

In the defendant's absence in the 2¼ years since his arrest, this family unit has suffered severely. Mrs. De La Cruz has struggled with emotional instability and has only been able to maintain marginal, intermittent employment. Without Mr. De La Cruz's financial support, all three children have had to withdraw from their parochial school, where they were thriving. The oldest two children, Dustin and Natasha, have shown signs of depression and their grades have declined markedly. The youngest child, Jeremy, for the present appears to be the least affected, but family members fear how he will adapt to the lack of a father as adolescence approaches. Moreover, the family's financial situation is extremely precarious, as they are constantly behind on rent and at times seem in danger of becoming homeless. Delilah De La Cruz desperately needs the support and assistance, both emotional and financial, that Jose De La Cruz formerly provided and could provide again, were he available to help her raise and maintain the

children.[1]

As reflected in the Presentence Report (PSR), Mr. De La Cruz served a three-year state sentence (about 1½ years actual time in custody) for his prior drug cases and probation violation, which terminated in 1994. Since then, with the exception of the matter that brings him before the bar, he has been in no serious trouble. Despite his limited formal education, Mr. De La Cruz worked very hard to support and guide his children.

The Presentence Report, relying on the now advisory guidelines, has computed a truly draconian sentencing recommendation upwards of 20 years. Were this sentence to be imposed, Mr. De La Cruz, who has already been incarcerated for approximately 27 months, would not be released from prison until he was well into his fifties. Were this defendant to survive such a truly onerous term of punishment (which he might not, given his high blood pressure, high cholesterol, chronic severe diabetes, and weight problem),[2] his children will all be grown and Mr. De La Cruz would have little to come back to.

The PSR bases its computation of 262 months on a mechanical application of the guidelines finding that Mr. De La Cruz falls into the career offender category [U.S.S.G.

. . .

---

[1] See subsequent social history section of this memorandum in which Mr. De La Cruz's personal and family history is described in detail.

[2] See PSR, ¶72.

5

§4B1.1(a)&(b)] due to two prior felony controlled substance convictions.[3] The Probation

Officer makes this finding despite the fact that this defendant's prior drug felonies

occurred 13 and 17 years ago, respectively, and the records show that between both cases

the sum total of contraband involved was about 1½ ounces (43 grams) -- which would

collectively only equate to a Level 14 on the drug table at U.S.S.G. §2D1.1(c)(13), prior

to any reduction for acceptance of responsibility.

Mr. De La Cruz's first drug conviction occurred 17 years ago, in 1989. He

received four months of local jail time and came within nine weeks of successfully

completing his probation. However, because Mr. De La Cruz's probation on the 1989

drug case was violated by his subsequent arrest in 1993, and because he was then

sentenced to prison jointly on the two cases, the first drug felony, which otherwise would

be too old to count, falls within the 15-year window during which, according to the

advisory guidelines, prior offenses can be counted with respect to criminal history and

career offender determination [see Application Note 1 which refers to U.S.S.G.

§4A1.2(e)(1), (2) & (3)]. This circumstance, which has had the rather extreme effect of

transforming Mr. De La Cruz's advisory Criminal History Category from II to VI, results

in a severe overstatement of his dangerousness and likelihood to reoffend. The Court is

therefore asked not to apply the Career Offender designation of the advisory guidelines to

this defendant, and not to add the many extra years of prison that such an application can

---

[3] See PSR, Pg. 16, ¶63.

6

carry.

In computing a guideline level of 20 years or more, the PSR has failed to recommend that Mr. De La Cruz be granted the full three-point decrease for Acceptance of Responsibility, because the Government has not yet moved for the third-point reduction available at §3E1.1(b). With respect to the typical three-level reduction for Acceptance of Responsibility for defendants who acknowledge their guilt and take responsibility, it should be noted that Mr. De La Cruz pled guilty to these charges within 6½ months of his arrest and never contemplated taking the case to jury trial on the issue of guilt or innocence, thus conserving the Government's resources. In fact, Mr. De La Cruz attempted to plead guilty on July 15, 2004 (barely nine weeks after his arrest) and notified the Court of his intent to enter a change of plea -- but was preempted when the Government filed a Superceding Indictment a day earlier, on July 14th, which included the §851 allegation.

It is true that Mr. De La Cruz was at one point scheduled for trial on sentencing issues, but so were many other defendants during the brief hiatus between Blakely and Booker due to the evolving state of the law. In any event, no such trial ever came close to happening, and neither side had to expend time or effort in trial preparation. Most significantly, Mr. De La Cruz has never denied that he took part in the conspiracy. In fact, he underwent several proffer sessions with case agents, which started on the very day of his arrest, and he has shown contrition at each stage of these proceedings.

Based on Mr. De La Cruz's overall life and background (see social history information incorporated into this memorandum and appended letters), and the fact that he has been a loving and supportive father who is badly needed at home, this defendant, through counsel, respectfully requests that the Court exercise its discretion under <u>Booker</u> and sentence him to a term of imprisonment of not more than ten years. Such a sentence is sufficiently retributive to punish Mr. De La Cruz for his offense, and provides more than adequate protection to society as mandated under 18 U.S.C. §3553(a).

Were Mr. De La Cruz to be sentenced to the requested ten year term, he would return home from imprisonment before his youngest son, Jeremy, is completely grown up. Such a sentence would deter and punish while sparing Mr. De La Cruz's mother, Maria De La Cruz, his father, Jesus De La Cruz, and in particular, his wife and three children the absolutely crushing prospect of 15 or 20 years of incarceration which he might not survive.

## II.

## DEFENDANT'S SOCIAL HISTORY

## SUPPORTS THE REQUESTED SENTENCE

18 U.S.C. §3661 states:

> No limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

With this in mind, and for the purpose of offering insight into the "history and characteristics of the defendant" as set forth at 18 U.S.C. §3553(a), the following information is provided.

A.    *Family Background*

Defendant Jose De La Cruz was born on February 19, 1968 in Venice, California. He was the sixth of nine children born to Jesus and Maria De La Cruz. Both of his parents came from salt-of-the-earth, hardworking backgrounds. Jose's father, Jesus, who will turn eighty next February, was born in the United States but was "repatriated" at the age of five when his own father was deported to Mexico during the Depression. Jesus' father, who had been a railroad worker and farm labor contractor in this country, suffered a crippling back injury which pushed the family into poverty. Jesus De La Cruz, the defendant's father, writes in his appended letter:

> ...I was born in Detroit, Michigan on February 20, 1927....
> We became very poor when my father left the United States
> and went back to Mexico... I was forced to work at the age of
> 7 to help provide for our large family as a shoe repairer. At
> the age of 11 I worked manufacturing shoes.
>
> My life became very hard at that point in my life because my
> father had fallen off of a scaffold and broke his leg and from
> that point became disabled. Since I was the eldest son, I had
> to take his place to be the provider of our home. I worked in
> Mexico until the age of 19 and then headed back to the
> United States... I began my first job here in 1946 and did
> whatever I could to find farm work or any type of
> construction or landscaping jobs. I helped to build and
> landscape Disneyland... In 1956 I found myself working in a

9

        machine shop that made and distributed parts to companies
        such as Howard Hughes Aircraft and Aero Space. I started as
        a janitor, cleaning and sweeping up metal shavings....

Jesus De La Cruz's hard work was recognized by his employer and he was given the opportunity to work as a machinist. Over the years, the small machine shop where he was employed made parts for the space shuttle and manufactured the "P.O.W. bracelets" which were worn by millions of Americans during the final years of the Vietnam war. He stayed in the machine trade for the next 30 years, finally retiring when the dual onset of diabetes and heart disease left him physically unable to continue.

The defendant's mother, Maria (nee Cortez) De La Cruz, was raised on an isolated farm in Mexico. She never had an opportunity to attend school, and grew up with all the rigors of rural labor. She immigrated to the United States at the age of 25, a single parent caring for the defendant's older half-sister, Estella Pacheco, who was then three years old. Maria De La Cruz recounts in her attached letter:

        ...I arrived in December 5, 1959. My first job was as a nanny
        in Venice Beach, California. One year later I met my
        husband to be, Jesus De La Cruz. As he was courting me, we
        attended church together and went dancing with friends. One
        year after that we got married... Soon after we began our
        family and had 9 children, 5 boys and 4 girls.... I did not
        work at that time. We sacrificed to save our money and then
        bought our first home with 3 bedrooms walking distance to
        the beach. As our family grew, I became determined to make
        larger living quarters for my children... I couldn't bear to see
        my little children squished with the older children....

        I began to work to see if I could make my home larger and

10

> saved as much money as I could to make this happen. I knew
> I would have to work really hard and I always asked God to
> give me strength. I got a job cleaning hotel room.... After the
> hotel job I began working in a factory then finally Santa
> Monica Hospital where I stayed for 25 years and retired.... I
> did my best and worked very hard to give my children a better
> life than I had....

Mrs. De La Cruz is extremely proud of the fact that although her family qualified

for food stamps or other forms of public aid, she never considered accepting any type of

assistance.

Notwithstanding their parents' hard work, the defendant and his siblings' overall

recollection is of being fairly poor. Before his mother was able to save the money to

enlarge their house, the family of eleven shared three bedrooms: Jose and his four

brothers in one room, their four sisters in another room, and their parents in the third

bedroom. The family had by this time settled at 827 Amoroso Place, the home that his

parents purchased for $19,000 in 1970. The community of Venice was, at that time, a

multi-ethnic, working-class beachfront neighborhood. Although it had a reputation as a

center of bohemian culture, it was also plagued by the usual trappings of poverty, such as

gangs, drugs, and substandard schools.

The defendant's siblings, who now range in age from 31 to 50, have remained very

close to one another, and for the most part have good jobs and are raising families of their

own. Their letters on behalf of the defendant are appended to this memorandum (see

Exhibit D).

11

B.     *Childhood And Adolescence*

Jose De La Cruz attended local public schools in Venice. Maria De La Cruz recalls in her letter, "Since my son was a young boy, Jose... was very obedient, well-mannered, very athletic and respectful to his father and I." Interviews with his brothers and sisters confirm that he did fairly well in school in his early years and was an excellent athlete, particularly in baseball. He was consistently one of the best players on his Little League teams, both as a shortstop and pitcher.

Unfortunately, due to the long hours that both of his parents had to work to support their large family, it appears that Jose, the sixth of nine children, was sometimes "lost in the shuffle." His cousin Adriana De La Cruz, a college graduate now employed in the medical profession, recalls, "In a sense they were latch-key children, though the term wasn't used then. But they would come home to an empty house since both parents were at work." For his part, Jose remembers that his parents were seldom if ever able to attend any of his Little League games or practices. In addition, Jose's father, hardworking as he was, struggled for quite a few years with a drinking problem.

The central memory that nearly everyone shares of Jose's early years is his bright, "sunny" disposition and his instinct for helping others. Jose's older sister, Martina Tippet, recalls a next door neighbor named Marshall Thomas who was "three years older than Jose, mildly retarded, and very, very attached to my brother. I don't know that Marshall had anyone else who played with him or treated him in quite the same way...

12

To this day, he still asks about my brother when we go back to visit."

Jaime De La Cruz, who is seven years younger than Jose, is the last of the siblings.

He writes:

> ...My brother Jose De La Cruz was very active in my life. My
> parents couldn't afford a lot in those days, such a big family
> and all.... So my brother Jose found a way to put me in youth
> football and he was the only one to come to my games.... He
> lifted my spirits and made me feel as though I could
> accomplish anything.
>
> ...when I started high school at Venice High, I began going
> through a faze. I wasn't doing well in school, my grades were
> low, I didn't care anymore. I had no desire for school or
> excelling in this world, I had more bad influences than I did
> good ones. I was at a crucial turning point in my life,... I got
> expelled and well, my brother Jose found out and he stepped
> in to mentor me by showing me the consequences of those
> who made wrong choices and had taken a veered path from a
> prosperous and respectable future. My brother was well
> known at my high school, he too had attended there and knew
> the coaches and teachers. Through his efforts they all came
> together to keep me... in school. They monitored my every
> class and my whereabouts on a daily basis....

The De La Cruz family's own recollections are echoed by former neighbors and

long-time friends. Joni Rountree, a real estate agent who lived nearby and has known the

family since 1971, writes:

> Joe was always a kid on the go, interested in so many things
> and seemed to enjoy living. Joe and his brothers and sisters
> would play out in the back of their house and you could
> always hear them laugh and really just love being together
> and love what they were doing. Joe impressed me as being a
> loving and very sensitive child.

13

Notwithstanding his people skills, athletic talent, and the strong work ethic that was passed onto him, Jose De La Cruz was, like his two older brothers, exposed to drug use early on in their Venice neighborhood. His first drug experience was sniffing model airplane glue (which was popular among his peers because "it barely cost anything") when he was 12 or 13 years old. Within the next few years, he would be successively introduced to marijuana, PCP, and cocaine.[4]

At the age of fifteen, Jose began working after school in the Food Service department of Santa Monica Hospital where his mother was employed. Most of his siblings worked at the hospital at one point or another, and his brother Joaquin De La Cruz describes this family "tradition" as "...both a good and bad experience for us. On the one hand, it taught us how to work hard from an early age, which was definitely a good thing. At the same time, it took our energies away from our studies, which was not so good. And that made us more focused on earning money than school, and I think this is what happened to Jose..."

Jose was employed at Santa Monica Hospital some 20 to 30 hours per week, starting in his sophomore year. Midway through his senior year at Venice High, he turned eighteen and left school in order to work full-time.

C.    *Employment, Marital History and Parental Responsibilities*

Jose was employed for approximately 2½ years as a food preparer at Santa Monica

---

[4] See Presentence Report, ¶75.

14

Hospital. When he turned 18 and left high school, he went to work full-time as a sweeper and clean-up man at the same machine shop where his father was employed. Over the next few years, he progressed to machinist trainee, alternating between Winter Engineering in Santa Monica and Delgado Engineering in Marina del Rey.

As the Court is aware from the Presentence Report, Jose De La Cruz's personal drug use problem led him into contact with drug sales and during this period he sustained two arrests and convictions. For the first in 1989, he received probation and local jail time; after a second arrest in 1993, he was sentenced to state prison on both cases concurrently.

Upon being paroled in 1994, Jose was hired as a plumber's assistant. He held a series of jobs in plumbing before branching into the related fields of cabinet making and custom aquarium design and production.

In the meantime, Jose had met his wife, Delilah (nee Medina) De La Cruz, in 1989. She was a month or two pregnant at the time. Though the child was not Jose's biologically, he has assumed responsibility for Justin De La Cruz financially, emotionally, and in every possible way since the boy's birth. In fact, it was not until a few years ago that Justin found out he was not Jose's natural son.

From the time Justin was young, Jose focused a great deal of time and attention on his development, both academically and athletically. Justin was naturally coordinated as a child, and according to the De La Cruz family, turned into an excellent football and

15

baseball player.

Jose's second child, Natasha, was born in 1991 and is described by the family as "her father's princess." She is characterized as a normally cheerful girl who is good at sports and worships her father. Diedre Robinson Powell, a former teacher who has written the Court, recalls in her appended letter: "He had such pride in his voice when he spoke about his kinship with his daughter Natasha. They were very close and she was never too shy to discuss anything with him."

The defendant's youngest son, Jeremy, now 10 years old, is described by Jose's cousin, Alvaro De La Cruz, a "a child prodigy. He's the smartest kid I've ever been around, period."[5]

As can be gleaned from the appended letters, Jose and Delilah De La Cruz had a relationship which was often positive but also at times quite stormy. Delilah is described as emotionally moody and was frequently on tempestuous terms with Jose's parents and siblings. Nevertheless, the couple stayed together for the better part of 15 years.

Whatever his flaws, Jose De La Cruz was, by every account, a highly affectionate and devoted parent to his three children. His sister, Margareta De La Cruz, writes in her letter:

> ...He was so good with his kids. He was always on them about doing their homework and the importance of an education. He tried daily to show them that a good education

---

[5] See letter from Alvaro De La Cruz, attached at Exhibit D.

would help them so much in their future. He would sit with them while they did their homework. He was at every school event, every sports game, every important moment in their lives.... One year my brother was a coach for his oldest son's football team for his school. This year that school won their first championship title in the history of that school. Those boys were a united team and that was because of my brother.

Adriana De La Cruz, Jose's cousin, writes:

...I was fortunate enough to get to tutor his children. It is during this time that I got to see firsthand how positive he was towards his family. Jose was responsible in taking the children to school, attending meetings with their teachers and picking them up from school. He would take them to their appropriate sports activities and make sure they did their homework. He was with them each day and night. He would make sure they were clean, properly dressed and well fed. In my opinion, he was their sole provider and guardian. I was very proud to have such talented and intelligent children to tutor. They were well-mannered and mild tempered. I was especially pleased that they excelled in school and had a great attendance record....

Diedre Robinson Powell is an eight grade teacher at St. John's Chrysostom School in Inglewood, California, where Jose's children attended. Her letter reads in part:

I first met "Coach Joe" in 1999, when his son Dustin Michael and his niece Dominique participated in a talent show hosted by student council. He sat patiently during our after school rehearsals and eventually become our test audience. He was very supportive of our efforts. In the years to follow we would sit together and cheer our kids as they competed in football, volleyball and basketball....

Eventually Coach Joe became part of our sports programs. He helped our coach, Mrs. Fran Martin, with both her girls and boys volley ball teams. When our coach for the boys'

17

team took a job at the high school next door to us in the spring of 2002, Coach Joe volunteered to coach our boys' flag football team that fall. He held try-outs before the end of the school year and worked to condition the team all summer long.

In my humble opinion, Coach Joe was the best thing to happen to our boys' program. At that time we had a group of boys in our eighth grade that lacked motivation and a work ethic. Many had not played on the team the previous year because of their poor academic behavior and grades. Coach Joe instilled a sense of pride in our boys. He shared with them his stories about making the wrong choices and suffering the consequences. He treated them with the same love and respect he showed for his own sons. Our students looked up to him. He visited my classroom weekly during the season to make sure that their grades were satisfactory. All of that hard work paid off in the end; our team took first place in our division and went more rounds in the play-offs than any team we have ever had.

D.    *Defendant's Health and Present Family Circumstances*

Like his father, the defendant suffers from diabetes, although Jose was diagnosed at a much earlier age. Jose also has high blood pressure and dangerously high cholesterol.[6] All of these conditions require carefully calibrated medication, special diet, exercise, and medical monitoring. All are exacerbated by stress. The defendant's family is extremely concerned that he does not always have access to the appropriate medications or medical advice in custody. His mother and father, in particular, worry constantly about their son's condition.

---

[6] The defendant reports that his cholesterol was recently gauged by medical staff at FDC Honolulu at 1,382. He was informed that a normal reading for that test is 157.

The irony, of course, is that Jose worries about his parents. His cousin, Adriana
De La Cruz, writes:

> ...the decline of his parents' health has been a source of
> anxiety for him. Jose's worst fear is that while in custody he
> may never see them again. His father is diabetic and is going
> blind. His mother developed a heart condition forcing her to
> take blood thinners for stroke prevention. Being separated
> from his family has been a daily struggle for Jose....

Mr. De La Cruz has tried to deal with his anxiety by staying busy. He has taken
the GED examination and is waiting for results. He has availed himself of every
educational opportunity available in the institution, including parenting classes, substance
abuse education, and art classes. He is on a waiting list for a number of courses. He is
also involved in regular Bible study. Adriana De La Cruz writes:

> ...Jose continues to improve his character, family values and
> goals. Jose has dedicated himself to improving his education.
> He has asked me to send him books and materials to help
> improve his reading and writing skills. He asked to be
> considered for your GED program, knowing there is a waiting
> list. I want to enroll him in a high school program to get his
> diploma. Jose realizes, by continued encouragement that
> education is the key to success....

No amount of effort on Jose's part, unfortunately, can do much to alleviate the
tenuous circumstances in which his wife and children now find themselves. Delilah De
La Cruz has been struggling to pay rent and meet the children's needs on her gross
earnings of $1,600 per month. The accumulating stresses and frustrations have left her
overwhelmed, and Jose's children have been badly affected. As previously mentioned,

they long ago transferred out of parochial school. His son Justin, the former football standout, has quit playing sports altogether. His school performance has declined markedly, and he was recently transferred out of regular high school to continuation school. On the positive side, he has acquired a part-time job at a market and is working steadily to contribute to the family income.

Perhaps most upsetting for Jose has been the academic decline and behavioral problems of his daughter, Natasha. She was teased by other girls when she transferred to her new public school, and has had some problems with fighting. In a letter received about 18 months ago, Deidre Robinson Powell of St. John Chrysostom wrote:

> ...Our students have tried to rally around Natasha and be supportive of her.... Next year she will join her brothers in public school. Natasha's grades have slipped and her mom is unable to come up to the school to check on her progress.... Natasha has been absent quite a bit this school year. Sometimes she is ill, and other times she has had to appear in family court. Her classmates and I try to send her work to her so she can keep up.
>
> I recently asked Natasha how often she and her brothers get a chance to communicate with her dad. Her face lit up; she smiled and said that they talk to him every day. While I am sure those five minute conversations are treasured by his children, I know they miss their father. He was a strong presence in their lives. Natasha and her brothers know that their father has made a horrible mistake. They make no excuses for their father's conduct. But they have forgiven him.

Delilah De La Cruz has also written a letter to the Court in which she confides:

My children have suffered so much. I have had to do my best to support them by myself, but at one point we were living in a weekly hotel situation, surrounded by people around whom I did not feel safe. My daughter has had terrible nightmares, and my oldest son is now in continuation school. Because of their rage at his absence, they have had disciplinary problems in school for the first time ever. They are still very angry at Joe, and they cannot understand how he can still love them and be so far away.

Delilah adds in her letter:

They would probably not have missed Joe so much, if it weren't for the fact that he was an excellent father. Joe was the kind of dedicated father who always insisted that the kids work hard in school. He picked up the kids and dropped them off at school. He took them to the park and athletic practices. He volunteered as a coach for the football team. He took them to church every Sunday, and he took them to the beach on Saturdays. He asked his cousin to tutor them when he could not help with their schoolwork. He did all the things that a father is supposed to do, and because of this history, our children long for him constantly.

I am not able to fill the gap, because I have had to find work, any kind of work.... I beg for your mercy for the sake of our children. They miss him terribly, and they and I are desperately hoping that one day we will be able to reunite as a family again. (See Exhibit C.)

Based on the above circumstances, the Court is asked to consider the defendant's family responsibilities and hardships as additional mitigation supporting the requested ten-year sentence.

///

///

21

## III.

## DEFENDANT'S COMMENTS REGARDING THE

## GUIDELINES AS CALCULATED BY THE PROBATION OFFICE

A.    *Defendant De La Cruz Accepts Full Responsibility for His Wrongdoing and*

*Should Be Granted the Three-Level Reduction per U.S.S.G §3E1.1*

Defendant Jose De La Cruz immensely regrets taking part in the drug conspiracy

that brings him before this Court.  He is well aware that what he did was wrong and he

accepts full responsibility for his actions.  He writes in his letter to the Court (appended

hereto as Exhibit A):

> Sometimes one needs to hit rock bottom before they realize
> what they have lost.  I have been blessed, however, by my
> family standing by me.  My family has also been responsible
> for me facing up for my wrongdoings, and taking
> responsibility for my actions.  I am ashamed that my wife and
> three children have to suffer for my actions and stupidity.  I
> haven't been the husband or father I should have been; they
> deserve so much more than who I was...
>
> I would like you to know that I accept full responsibility for
> my actions, and I am thankful that I was stopped, so that I
> could learn what was truly important in my life.  I accept
> whatever sentence your mercy allows you to impose upon me.
> I will utilize the time to the best of my ability to prepare for a
> future with my family.

Mr. De La Cruz pleaded guilty and, as the transcript of his change of plea hearing

reflects, admitted that he distributed methamphetamine.  He has made it clear in his

verbal and written comments that he accepts complete responsibility.  Moreover, he has

22

met on three occasions with law enforcement agents in proffer sessions, and has sought to provide substantial assistance in the investigation and prosecution of other individuals engaged in illegal activity.[7]

In general, it is certainly the norm that a Federal defendant who has pleaded guilty and shown remorse will be granted the reduction for acceptance of responsibility. In this case, to withhold such a reduction from Mr. De La Cruz when he has pled guilty and has reiterated both verbally and in writing his acceptance of responsibility, would seem unduly severe. Defendant De La Cruz, through counsel, respectfully requests that the Court find that he indeed accepts responsibility for his crime, and to the extent that the advisory guidelines apply, grant him the full reduction per both §3E1.1(a) and §3E1.1(b).

B.      *Defendant Jose De La Cruz Does Not Fit into the Category of Offenders That the Career Offender Classification in the Guidelines Is Designed to Protect Society Against*

The Career Offender category under the guidelines [see U.S.S.G. §4B1.1] is designed to protect society from repeat drug and/or violent offenders who because of an incorrigible and/or dangerous criminal lifestyle must be permanently incapacitated in order to protect society from their criminogenic tendencies. Although there are certainly instances in which such extreme measures may be necessary, it is both just and logical to

_____

[7] See letter from former defense counsel William Harrison to AUSA Sorenson, dated August 16, 2004 and attached hereto as Exhibit B.

23

determine on a case-by-case basis whether a particular offender appears to pose sufficient danger to society to warrant the extremely harsh sentence that is triggered by career offender status.

In the case of this defendant, his predicate offenses under §4B1.1 occurred 17 and 13 years ago, respectively.  Furthermore, his second drug felony conviction, for possession in a car of 8.8 grams of cocaine (just over two "eighths" of an ounce), could easily have been treated as a simple possession which under the guidelines would not count as a "controlled substance offense."

U.S.S.G. §4B1.2(b) sets forth:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

In other words, the "controlled substance offense" as a predicate for triggering career offender status is meant to apply to cases in which the offender's intent was to distribute, not to simply possess for the purpose of personal consumption.  Thus, it would appear that in the case of Mr. De La Cruz, although he was charged and convicted of possession for the purpose of distribution, the extremely small amount involved and the borderline nature of the conduct would make it just as logical to view it as a simple possession case, which would have precluded any consideration as a predicate felony for

24

career offender application.

In this same vein, the Ninth Circuit has affirmed a downward departure from the career offender guidelines where the predicate felonies were for sales of small amounts of drugs. See United States v. Reyes, 8 F.3d 1379, 1383-88 (9th Cir. 1993). In Reyes, the court chose to depart despite the fact that the defendant had six prior convictions for small amounts. Thus, a lack of severity in the defendant's prior criminal history, based on the borderline nature of that prior criminal activity and not just the number of convictions, can be a basis for a departure.

Furthermore, in circumstances very relevant to Mr. De La Cruz, in United States v. Fletcher, 15 F.3d 553,557 (6th Cir. 1994), the court departed downward from career offender to Level 29 and Category V based on the age of the prior convictions; the time intervening between the priors and the current crime; and the defendant's responsibilities. In affirming, the court of appeals noted that the district court can consider the age of the priors in determining the likelihood of recidivism. In United States v. Shoupe, 988 F.2d 400, 447 (3rd Cir. 1993), the court held that it is permissible to consider a defendant's age and immaturity when priors were committed in determining whether his criminal history with respect to the career offender enhancement over-represents criminal history.

When Mr. De La Cruz was arrested on his first possession for sale case, he was 21 years old and was placed on probation with 4 months in the county jail. His subsequent arrest occurred four years later in 1993, just 9 weeks before his probation on the earlier

case was to expire.  The only reason the first felony does not fall outside of the 15-year

window for purposes of criminal history calculation is because Mr. De La Cruz, in his

plea deal, admitted the probation violation and was sentenced jointly on the two cases to

state prison concurrent, thus barely prolonging the life of the 1989 conviction into the

range where it can be considered for career offender.

Between his arrest in 1993 and his arrest in the instant matter, Mr. De La Cruz has

worked, volunteered in the community, and raised a family.  He does not fit the profile of

the sort of incorrigible repeat offender that the career offender enhancement was designed

to incapacitate.  He does not have any history of violence.  He is a fairly normal person

who has struggled with addiction and a panoply of personal problems, but for the most

part has lived a quiet life characterized by raising and supporting children and working at

the sort of jobs that were available to him given his felony convictions as a youth.

For the reasons set forth herein, Defendant, through counsel, requests relief, either

through departure or general mitigation as allowed for in <u>Booker,</u> away from a career

offender determination which would be unduly harsh.

C.    <u>*No Upward Adjustment is Warranted for Role in the Offense*</u>

Mr. De La Cruz recognizes that an argument for minor role is not appropriate

based on the nature and extent of his participation.  By the same token, his sentence

should not be enhanced as an organizer, leader, or supervisor in the conspiracy.  The

commentary in U.S.S.G. §3B1.1 makes clear that the purpose of this section is to enable

the sentencing court to take into account a defendant's relative responsibility within a

criminal hierarchy.

The Ninth Circuit has held that for a defendant to be a leader or an organizer,

"there must be evidence that the defendant 'exercised some control over others involved

in the commission of the offense [or was] responsible for organizing others for the

purpose of carrying out the crime,'" "not merely that the defendant was more culpable

than others who participated in the crime." United States v. Harper, 33 F.2d 1143, 1150-

51 (9th Cir.1994), cert. denied, 513 U.S. 1118, 115 (1995) (quoting United States v.

Mares-Molina, 913 F.2d 770, 773 (9th Cir. 1990) (quoting United States v. Fuller, 897

F.2d 1217, 1220 (1st Cir. 1990))).  There must also be "some degree of organizational

authority over others..." United States v. Mares-Molina, 93 F.2d 770, 773 (9th Cir.

1990).

In a decision similar to the ones cited above, United States v. Hoac. 990 F.2d 1099

(9th Cir. 1993) *cert. denied*, 127 L.Ed. 2d 390, 114 S.Ct. 1075 (1994), the Circuit took

issue with the District Court's two-level enhancement for an aggravating role and

remanded for re-sentencing.  The Court held at pages 1111-1112:

> We do not believe that the District Court, properly applying
> the Mares-Molina standard, could have found by a
> preponderance of the evidence that Chan was "an organizer,
> leader, manager, or supervisor" under 3B1.1(c).  At
> sentencing the government argued that the two-level increase
> was justified because Chan opened the trading company to
> export the heroin, reserved a shipping date and arranged for a

27

shipping container, assisted by Leung in placing the heroin in
the cans and loading the shipping container, was promised
$50,000 - $70,000 by Leung if the shipment was successful,
and at the time of his arrest possessed the rental contract and
keys for the packing warehouse. While all of these facts
suggest that Chan was perhaps one of the more culpable
defendants, they do not indicate that he exercised "control
over others" or was "responsible for organizing others" so as
to justify an increase under 3B1.1(c)... Organizing the
importation...is not the same as organizing other conspirators
and does not satisfy Mares-Molina.

Because no evidence indicated that Chan exercised control
over other defendants or was responsible for organizing them,
Mares-Molina requires us to hold that the District Court's
finding that Chan was "an organizer, leader, manager or
supervisor" was clearly erroneous.

There is no legal basis for an aggravating role adjustment here. There was no

criminal organization or hierarchy. While Jose De La Cruz may have been the most

culpable of the three defendants, he was not their overseer or boss. He certainly did not

supervise his brother John De La Cruz, who is older than Jose by five years and was

someone that Jose sought to emulate while growing up. To say that this offense which

was committed by two brothers and a taxi cab driver constituted any type of structured

criminal enterprise would be overly grandiose. Mr. De La Cruz was essentially a solo

operator. His role was as an independent broker who, on a limited number of occasions,

obtained a drug shipment from a supplier in California and forwarded it for sale to

customers in Hawaii. Simply procuring drugs – in essence, being a link in the chain –

does not equate to being a supervisor, organizer or leader. No adjustment for role in the

28

offense, either upward or downward, should apply.

## IV.

## THE FACTORS SET FORTH IN 18 U.S.C. §3553(A) PERMIT AND ENCOURAGE THE COURT TO IMPOSE A SENTENCE SUBSTANTIALLY DIFFERENT FROM ANY ADVISORY GUIDELINES THAT MIGHT ONCE HAVE BEEN CONTROLLING

The overwhelming weight of authority following United States v. Booker, 125

S.Ct. 738 (2005), is that the guideline range is one of seven factors that the Court must

consider but it carries no greater weight in the sentencing calculus than any of the other

factors identified in §3553(a). Nowhere in the Booker decision does the Supreme Court

indicate that sentences outside of the guidelines are to be considered unusual. Nor does

the Supreme Court indicate that the guidelines are entitled to any presumption of

correctness. [See, e.g. United States v. Ranum, 353 F. Supp. 2d 984 (E. D. Wisc. 2005)

in which the court held that "in every case, courts must now consider all of the §3553(a)

factors, not just the guidelines"; see also United States v. Moreland, 366 F. Supp.2d 416,

418 (S.D.W. Va. April 27, 2005) ("Importantly, while I respect the advice of the

Guidelines and give it serious consideration, I do not view that advice as carrying greater

weight than any of the other §3553(a) factors. That is, I do not view the guideline range

as being presumptively reasonable"); United States v. Myers, 353 F. Supp. 2d 1026 (S.D.

Iowa 2005) ("To treat the Guidelines as presumptive is to concede the converse, i.e.; that

any sentence imposed outside the Guideline range would be presumptively unreasonable in the absence of clearly identified reasons.  If presumptive, the Guidelines would continue to overshadow the other factors listed in §3553(a), causing an imbalance in the application of the statute to the particular defendant by making the Guidelines, in effect, still mandatory."); Simon v. United States, 361 F. Supp. 2d 35 (E.D.N.Y. 2005) ( "I adopt the view that the Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by §3553(a)."); and United States v. Biheiri, 356 F. Supp. 2d 589, 594 n.6 (E.D. Va. 2005) (No individual factor is singled out as having greater weight; instead, the richness of factual diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances.  Thus, the Guidelines sentencing range is not entitled to "heavy weight...").

Under Booker, the remedial majority held that district courts must still consider the guideline range, 18 U.S.C. §3553(a)(4)&(5), but must also consider the other directives set forth in §3553(a).  Thus, sentencing courts can now consider the guidelines within the context of a broader range of sentencing objectives and purposes.  These purposes, as set forth in §3553(a)(2), are:

    (A)    retribution (to reflect the seriousness of the offense, to promote respect for the law, and to provide "just punishment");

    (B)    deterrence;

(C)     incapacitation ("to protect the public from further crimes"); and

(D)     rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

In the spirit of this directive from §3553(a), the above-referenced sentencing aims are briefly examined as they apply to the nature and circumstances of this particular offense and the history and characteristics of this defendant:

Retribution:  As indicated by his appended letter to the Court, Mr. De La Cruz accepts full responsibility for his actions.  A decade in Federal prison would be a punitive experience for anyone, but particularly so for a man who will be faced with the prospect of his loved ones slipping away.  Mr. De La Cruz's parents are elderly and in declining health.  His father is so ill that he cannot travel long distances, and has been unable to see the defendant since his arrest 2¼ years ago. Mr. De La Cruz fears that his parents may not live long enough to see his release. Of paramount concern are his three children, who have been adversely impacted in multiple ways by his absence.  Moreover, the defendant's own health is increasingly poor.  A term of 10 years in Federal custody, of which Mr. De La Cruz would have to serve fully 85%, represents very real and tangible punishment for this defendant.

Deterrence:  A sentence of 120 months in prison for Mr. De La Cruz will send a message to the community that involvement in a drug conspiracy at any level will

31

result in an extremely stern sentence. No reasonable person could construe a ten

year prison term for Mr. De La Cruz as "getting off lightly." This is particularly

true because the guidelines are already so incredibly punitive for

methamphetamine when compared with cocaine, heroin, or virtually any other

drug.[8]

Incapacitation: The letters of support written on Mr. De La Cruz's behalf indicate

that he is cherished by his family and will be welcomed home upon his release

from prison. In his own letter to the Court, Mr. De La Cruz has expressed

contrition for his actions and has pledged to never again engage in any form of

illegal conduct. Though only in his late thirties, Mr. De La Cruz has nearly all of

the risk factors for coronary disease, heart attack, stroke or diabetes. Given these

factors, ten years of incapacitation will offer the public more than adequate

protection and give this defendant ample time to internalize that he can never again

violate the law or partake in anti-social behavior.

Rehabilitation: Neither Mr. De La Cruz nor undersigned defense counsel can

dispute the fact that he has a prior criminal record and a history of abusing

marijuana and cocaine. A sentence of 120 months in custody will enable Mr. De

---

[8] See, for example, the 100 to 1 ratio between methamphetamine and cocaine on the drug table, and
the fact that methamphetamine is one of only two drugs - the other being PCP - which carries enhanced
penalties for exceeding a certain purity level. It is somewhat anomalous that a relatively lower-echelon
participant with a pound of methamphetamine should start at the same level on the guideline grid as a
defendant with 75 or 100 pounds of cocaine, worth exponentially more money.

La Cruz to pursue whatever educational and developmental programs the BOP

(Bureau of Prisons) has to offer [i.e. obtain "correctional treatment" --

§3553(a)(2)(D)].  Upon his release from prison, Mr. De La Cruz has been

guaranteed employment as a window installer in a company owned by his brother-

in-law in order to receive a regular paycheck with which to support his family.

Any time in prison beyond 120 months would not promote greater rehabilitation,

but, conversely, would inhibit Mr. De La Cruz's ability to rebound from his

transgression and move forward toward a productive, law-abiding life.

The nature and characteristics of Mr. De La Cruz's offense, and his personal

history and characteristics, have been discussed at some length in both this sentencing

memorandum and in the appended letters.  The inescapable conclusion to be drawn from

the sum total of this investigation into this man's life is that Defendant Jose De La Cruz

is a decent man who, although flawed like many, is eminently salvageable and should not

be relegated to unnecessarily lengthy imprisonment.

V.

## DEFENDANT DE LA CRUZ REQUESTS THAT THE COURT RECOMMEND

## THE 500 HOUR RDAP (RESIDENTIAL DRUG AND ALCOHOL PROGRAM)

As noted in the Presentence Report at ¶¶75-76, Mr. De La Cruz has struggled with

problem drug abuse since he was in his teens and continuing off and on until shortly

before his arrest on the instant matter.  In its informational materials, the Bureau of

Prisons describes the RDAP (Residential Drug and Alcohol Program) as follows:

> The residential drug treatment program is a unit-based
> program that affords inmates up to 500 hours of treatment,
> focusing on individual responsibility and changing future
> behavior. The goal of the program is to attempt to identify,
> confront, and alter the attitudes, values, and thinking patterns
> that led to criminal behavior and drug or alcohol use...

Mr. De La Cruz's long-term pattern of drug use suggests that he needs to confront his addictive personality and proclivities. The RDAP program's focus on attempting to not only "identify" but to "confront, and alter the attitudes, values, and thinking patterns that led to criminal behavior and drug or alcohol use" would seem to be of benefit to this particular defendant.

Based on these factors, Defendant De La Cruz requests that the Court recommend his participation in the 500-hour RDAP program in the hope that the Bureau of Prisons will consider this recommendation at the time of designation.

## VI.

## FAMILY AND COMMUNITY SUPPORT

Letters from family members, former co-workers and friends of Jose De La Cruz describe his devotion and dedication to his family and the positive strides he was making before he was arrested. According to the individuals writing on his behalf, the defendant is highly remorseful for his misdeeds, has considerable potential, and clearly recognizes that his mistakes have "cost him the one thing that he cares about most -- his family." All

letters are included in full at Exhibit D. The defendant's oldest sister, Estella Pacheco,

writes:

> Jose has always been a loving brother and...has always been
> there for me when I needed him most. When I needed his
> advice he has been there to give it to me without judgment.
> Joe as we call him has been a loving uncle to my children
> along with all his other nieces and nephews. My kids have
> always looked up to Joe almost as if he were their father.
> Unfortunately my children grew up without a true father
> figure in their life. I have been a single parent for 18 years.
> So my children only had their uncles to rely on for all those
> questions kids have when growing up. I was able to raise
> them to the best of my ability with the help from my brother
> Jose who has cared for them. You can't imagine how much I
> miss him. Especially during the hard times in life where I
> was able to pick up the phone and say "Hey brother can you
> come to visit?" My kids miss and love him very much.
>
> Jose is a great father to his kids. They are his entire life. He
> was very involved in their everyday life. For example he kept
> his children involved in sports year after year.... In addition,
> he made very effort to keep them in private schools. In hope,
> that they would receive a better education, than he had
> growing up.

Alvaro De La Cruz, cousin, writes:

> ...He's always been a nice guy, which is another important
> trait. I've never seen Joe be mean or disrespectful to anyone.
> Sometimes when I get angry at someone I think what would
> Jose do and calm down. He never had a negative bone in his
> body.... I pray every night that God has mercy on Jose,... I
> could only imagine how difficult it must be for Jose's wife,
> children and parents.... A long imprisonment would be
> absolutely catastrophic and devastating....

Jose's older sister Sylvia Sandoval writes:

35

...I know my brother is remorseful and sorry for what he did. It has been rough for everyone. For the past two years, my parents are struggling with years going by wondering if they will ever see their son again before they die.

Jose made a bad choice, and I believe that he knows it. Jose's incident has affected his entire family, especially his children, who need him now in their lives, where they are beginning to know who they are and what they want to become. I work at a middle school, and I have seen it for too many years where adolescents are growing up without their fathers, and we all know how important it is for a male figure to be involved in the lives of their children.

I pray that you will have compassion for my brother to prove that he can be a good citizen to his family and his community.

And Diedre Robinson Powell closes her letter:

Your Honor, I do believe that Coach Joe is a good man who took a calculated risk to make fast money. I truly believe that his poor decision was based on his desire to provide a good life for his family. Although it is not a choice that I would make, I realize that as a college graduate, I have more options in society. Coach Joe had been incarcerated in his youth. We have a system that allows people to make restitution to our society, but our society limits their options upon their release.....

Yet, if a man's character can be judged by the actions of his children, then Coach Joe is a man of great character. His children are awesome. They have been taught the difference between right and wrong and practice making the right choices daily....

I received a letter from Coach Joe. He apologized for his actions and asked for forgiveness. I do forgive Coach Joe. He has always been there to support me with my work with all of my students. My family and I keep him and his family

36

in our prayers.

## VII.

## CONCLUSION

There are a multitude of mitigating factors in this case which remove it from the heartland and would have justified departure below the formerly mandatory Guidelines. With the recent Supreme Court decision in Booker establishing the United States Sentencing Guidelines as advisory, and as only one of numerous legitimate factors to be considered by a sentencing court under 18 U.S.C. §3553, the Court is free to consider the various grounds presented by counsel here and to impose a sentence of ten years on its own merits, absent the more stringent standard of reviewability for Guideline departures that may previously have existed.

The case at hand presents a glaring example of the failure of the mandatory sentencing guideline system to address the human elements necessarily inherent in the Federal sentencing process. Regardless of the perhaps understandable impetus to continue using the now-advisory Guidelines as a starting point in sentence calculation, there will at times be cases in which the other factors in 18 U.S.C. §3553(a) deserve much greater weight than any Guideline factors. This is clearly one such example.

As articulated in United States v. Huerta-Rodriguez, 8:04 CR365, District of Nebraska, the sole limiting criteria is reasonableness. The sentencing court in that case keenly observed:

37

Significantly, the Supreme Court neither held, nor implied, that the measure of reasonableness is the Guideline sentencing range. Indeed, this court is mindful that "any system which [holds] it *per se* unreasonable (and hence reversible) for a sentencing judge to reject the Guidelines is indistinguishable from the mandatory system" that the Supreme Court found unconstitutional. *Id.* At 794 (Scalia, J., dissenting). This court's determination of reasonableness in the first instance, then, will be guided by the statutory factors set out in 18 U.S.C. §3553(a), together with consideration of the now-advisory Guidelines. *See Id.* at 766-767 (remedial majority opinion).

In the matter at bar involving Defendant Jose De La Cruz, a consideration of all of the factors set forth by Title 18 U.S.C. §3553(a), militates for a sentence of not more than ten years which would yield stern punishment yet at the same time offer Mr. De La Cruz the opportunity of rehabilitation and redemption.

Dated: July 31, 2006                          Respectfully submitted,


                                              CRIMINAL DEFENSE ASSOCIATES


                                 By           *Alan R. Baum*
                                              ALAN R. BAUM
                                              Attorney for Defendant
                                              JOSE DE LA CRUZ

38

# *APPENDIX*

Exhibit A          Letter to the Court from Defendant Jose De La Cruz

Exhibit B          Letter from Former Defense Counsel William Harrison to AUSA
                   Kenneth Sorenson, Dated August 16, 2004

Exhibit C          Letter to the Court from Defendant's Wife, Delilah Medina De La
                   Cruz

Exhibit D          Letters of Support from Friends, Family and the Community

Exhibit E          Letter from Ronald K. Nudelman, M.D., Treating Physician for
                   Defendant's Father, Jesus De La Cruz